CHRISTOPHER J. CARR (SBN 184076)
Chris.Carr@Bakerbotts.com
NAVI SINGH DHILLON (SBN 279537)
Navi.dhillon@bakerbotts.com
SHAMUS FLYNN (SBN 311793)
Shamus.flynn@bakerbotts.com
BAKER BOTTS LLP
101 California Street, Suite 3600
San Francisco, California 94111
Telephone: (415) 291-6200

Attorneys for Plaintiffs
SAVE OUR RECREATION, SAN FRANCISCO DOG
OWNERS GROUP (SFDOG), MARIN COUNTY DOG
OWNERS GROUP (Marin DOG) and COASTSIDE DOG
OWNERS GROUP (Coastside DOG)

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| SAVE OUR RECREATION, SAN FRANCISCO DOG OWNERS GROUP, a 501(c)(3) non-profit organization, MARIN COUNTY DOG OWNERS GROUP, and COASTSIDE DOG OWNERS GROUP a 501(c)(3) non-profit organization, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF THE INTERIOR,  NATIONAL PARK SERVICE and GOLDEN GATE NATIONAL RECREATION AREA, <br><br> Defendants. | Case No. <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.    Plaintiffs Save Our Recreation, San Francisco Dog Owners Group (SFDOG), Marin County Dog Owners Group (Marin DOG), and Coastside Dog Owners Group (Coastside DOG) (collectively, Plaintiffs), by and through their undersigned counsel, bring this action against the United States Department of Interior, National Park Service (NPS) and Golden Gate National Recreation Area (together, Defendants) to remedy violations of the Administrative Procedure Act (APA), the National Environmental Policy Act (NEPA) and the regulations implementing the National Park Service Organic Act (Organic Act).  Plaintiffs allege as follows:

### THE CONTROVERSY

2.    This controversy stems from the relentless effort by NPS—through successive Golden Gate National Recreation Area (GGNRA) Superintendents—to significantly alter the patterns of dog walking that has occurred for over half century in the GGNRA, an urban recreation area spanning more than 80,000 acres across San Francisco, San Mateo, and Marin Counties.

3.    In publishing the 2019 GGNRA Superintendent's Compendium (2019 Compendium), GGNRA has circumvented multiple statutory and regulatory requirements in an attempt to smuggle into law, without requisite process or support, significant limitations and restrictions on dog walking within the GGNRA.

4.    The GGNRA is an "urban park" and critical recreational resource for residents of the San Francisco Bay Area.  Local residents have walked their dogs on those urban recreation lands for many decades, and long before the creation of the GGNRA in 1972.  Thousands of San Francisco Bay Area residents walk dogs in the GGNRA every day.

5.    Dog walking is specifically enumerated as a recreational activity in the House report on the GGNRA's creation, House Report No. 92-1391, p. 4852:  "On a nice day, it will satisfy the interest of those who choose to fly kites, sunbathe, walk their dogs, or just idly watch the action along the bay."  Not surprisingly, the continuation of such historic recreational uses was part of the "deal" that brought the GGNRA into existence, and is a commitment by the federal government reflected in the GGNRA Enabling Act.  In the nearly fifty years since the

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

GGNRA was created, the need for such recreational access has only become more pressing, as the areas surrounding the GGNRA have become more developed and grown in population.  The many decades of dog walking on the lands now within the GGNRA is not only well-documented but has animated, in part, demands of the Boards of Supervisors of San Francisco, Marin and San Mateo Counties that NPS officials recognize the historical uses and adhere to the deal that the federal government made with those counties when the GGNRA was created.

6.     Starting in the early 2000s, the GGNRA commenced planning processes through which, over the course of more than a decade, it would seek to radically reduce access to GGNRA lands for people walking dogs.  The General Management Plan/Final Environmental Impact Statement (GMP/FEIS) for management of the GGNRA, released in 2014, pre-determined this radical reduction in access for those wishing to walk dogs in the GGNRA, and the Final GMP did the same.  NPS also developed a more specific Dog Management Plan (DMP) with its own Supplemental Environmental Impact Statement (SEIS), closing the comment period in February 2014.

7.     In fall 2015, in order to be fully informed and prepare effective comments on proposed regulations to implement the GGNRA's plans for reducing access for people and their dogs, Plaintiffs sent the GGNRA a FOIA request for relevant public records.  In February 2016, NPS published its proposed rule modifying regulations to implement the agency's "preferred alternative" (Dog Rule) which, to no one's surprise, would radically reduce access to GGNRA lands for people to walk dogs.  In the meantime, the GGNRA had "slow-walked" production of and purposefully blocked access to the information called for by Plaintiffs' FOIA request.  It was apparent that as part of its long-term "strategy," the GGNRA decided to delay production of and keep from public view certain records because it did not want them to be used in connection with the public comment process for the Dog Rule, or in connection with potential future lawsuits challenging its decisions to unlawfully restrict and reduce dog walking.

8.     The GGNRA's failure to respond to Plaintiffs' FOIA request forced them to file suit.  Plaintiffs filed their FOIA suit in this Court on April 5, 2016.  Case 3:16-cv-01724-JD.  The

-3-

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

public records ultimately obtained, over the GGNRA's fierce resistance, revealed the lengths to which the GGNRA would go to prosecute its permanent crusade against dog walking on the federal public lands it manages in the Bay Area.  This misconduct included, but was not limited to:

- GGNRA staff sending e-mails about efforts to restrict dog walking to and from private e-mails, among each other and NGO representatives supporting those efforts;

- GGNRA staff sending e-mails to other staff asking the recipients to delete e-mails about efforts to restrict dog walking, and noting that "[t]hese conversations are best done by phone";

- GGNRA staff soliciting NGO supporters of restrictions on dog walking to attend meetings convened by members of the Bay Area congressional delegation;

- GGNRA staff soliciting NGO supporters of restrictions on dog walking to submit letters to the editor to the San Francisco Chronicle and other Bay Area newspapers (and collaborating on the contents of the letters);

- GGNRA staff drafting talking points for NGO supporters of restrictions on dog walking to use with media and in meetings with members of the Bay Area Congressional delegation;

- GGNRA staff and NGO supporters of restrictions on dog walking colluding to discourage Speaker Pelosi's office from inquiring about those efforts;

- GGNRA staff expressing disdain for then-Supervisor Wiener as a result of his objections to their efforts to restrict dog walking;

- GGNRA staff expressing contempt for Dog Owner Groups; and

- GGNRA staff deliberately excluding scientific evidence because it could have supported less restrictive limitation on access for dog walking.

9.     The great majority of these troubling records were not disclosed by the GGNRA until October 2016 in direct response to Plaintiffs' FOIA lawsuit, after the GGNRA had already

-4-

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

disclosed thousands of other public records under order of this Court.  Plaintiffs published many of the troubling records to raise public awareness about the mismanagement of public lands on a website:  https://www.woofieleaks.com/.

10.     In December 2016, NPS published notice of its intention to finalize the Dog Rule, to implement exclusions and restrictions on dog walking in the GGNRA based on the Dog Management Plan.  On January 10, 2017 and based on the troubling materials produced in response to the FOIA litigation, Representative Jackie Speier, a senior member of the Bay Area's congressional delegation whose district includes GGNRA lands in San Mateo County, sent a letter to the Inspector General of the Department of the Interior calling for an "independent inquiry into whether NPS employees acted improperly with regards to their work on the GGNRA Dog Management Plan."  Representative Speier continued: "The use of personal e-mail to improperly coordinate with outside advocacy groups is potentially illegal and must not be allowed."  That same day, NPS announced it was indefinitely delaying promulgation of the Dog Rule to investigate whether the GGNRA staff's use of personal email violated the law or Park Service policies.

11.     In December 2017, the NPS formally terminated the GGNRA's effort to impose a Dog Rule.  At that point, Plaintiffs understood GGNRA had ended its crusade to exclude people and their dogs from the lands it manages.

12.      Having failed to unlawfully curtail dog walking, the GGNRA is now taking a new approach to achieve the same end.  On August 30, 2019—the Friday before Labor Day weekend—the GGNRA posted on its website its  "2019 Superintendent's Compendium."  The 2019 Compendium purports to amend the existing 1979 Pet Policy by imposing significant new requirements for and restrictions on access for people with dogs.  While not identical, the 2019 Compendium is substantially similar to elements of the withdrawn Dog Plan.  Many of these amendments, including changes made to the definitions of "Unmanaged Dogs," "Voice Control," and "Managed Dogs" mirror measures contained in that failed Dog Plan.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

13.     This is a variation on a theme the GGNRA has been playing for the last two decades, as it has tried to limit and restrict the ability of Bay Area residents to walk their dogs on federal public recreation lands in San Mateo, San Francisco and Marin Counties.  Over that time, this Court has ruled on several occasions that the GGNRA failed to follow its own regulations and provide the required notice and opportunity for public comment when making similar changes.

14.     With the 2019 Compendium, the crusade to exclude people and their dogs from the GGNRA has resumed.  The restrictions and limitations on access and use for people with dogs that the 2019 Compendium purports to make mirror many of the restrictions and limitations that the GGNRA had sought to impose through its ill-fated Dog Rule. That Rule – which the agency pursued through notice-and-comment rulemaking -- was predicated on a Dog Management Plan that had been years in the making, and an Environmental Impact Statement (EIS) (and Supplemental EIS) that the GGNRA believed NEPA required.

15.     The changes to dog walking that the 2019 Compendium purports to work run afoul of the NPS regulations authorizing superintendents to institute closures and public use limits.  Unless such an action is routine, minor and uncontroversial, and does not cause a significant alteration in public use patterns, it must be undertaken through notice-and-comment rulemaking.  The changes to access for people and their dogs worked by the 2019 Compendium have not been imposed through notice-and-comment rulemaking.  Nor have their impacts been evaluated as required by NEPA; instead, the GGNRA purports to have relied on a NEPA categorical exclusion.

16.     Plaintiffs file this action seeking the Court's intervention to once again prevent the GGNRA from violating the law in this revival of its crusade to drive people and their dogs from the urban recreation lands it is charged with managing – this time trying to sneak significant exclusions and restrictions by the public through use of the Superintendent's 2019 Compendium.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**JURISDICTION**

17.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and 5 U.S.C. §§ 701-706 (APA).

18.     The core requested relief is authorized by 28 U.S.C. §§ 2201-02 (declaratory and injunctive relief) and 5 U.S.C. § 706(2) (vacatur).

**VENUE**

19.     Venue is proper in this district under 28 U.S.C. § 1391(e).  Defendants consist of a federal agency and an administrative unit of that agency.  A substantial part of the events and omissions giving rise to the claims in this action occurred in and/or relate to San Francisco County, which is located within this judicial district.  Further, some of the Plaintiffs reside in San Francisco County, making venue proper in this judicial district pursuant to 5 U.S.C. § 552(a)(4)(B).

**INTRADISTRICT ASSIGNMENT**

20.     A substantial part of the events and omissions giving rise to the claims in this case occurred in San Francisco, making the San Francisco Division an appropriate venue under Civil L.R. 3-2(d).  Plaintiffs understand that many of the documents improperly withheld are located at Defendants' offices located within San Francisco County.

**PARTIES**

21.     Save Our Recreation was founded in 2014 amid concerns that certain GGNRA actions would impose restrictions on recreational access for all user groups, not just dog owners.  It has over 10,000 supporters.  Save Our Recreation serves as an umbrella group to bring together people and organizations supporting recreation in the GGNRA.  Save Our Recreation is dedicated to preserving access for all recreational users in the GGNRA, as well as advocating for a comprehensive process to address recreational access that includes public input, independent voices, and thoughtful consideration.  All other Plaintiffs in this action are members of Save Our Recreation.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

22.     San Francisco Dog Owners Group (SFDOG) was founded in 1997 in response to closures at Ocean Beach by the GGNRA.  SFDOG incorporated in 2000, and has over 900 dues-paying members and two email list-serves that reach roughly 750 people.  SFDOG is a non-profit organization that promotes responsible dog ownership/guardianship, offers educational programs for both dog owners/guardians and the general public, and works for increased off-leash recreational opportunities for responsible dog owners/guardians and their canine companions.  SFDOG is the premier citywide dog advocacy organization in San Francisco and works with park-specific dog groups (*e.g.*, Dolores Park DOG, Duboce DOG, etc.) throughout San Francisco.  It has held workshops with and actively collaborated with the San Francisco Parks and Recreation Department, San Francisco Animal Care and Control Department, the San Francisco SPCA, the Boys and Girls Clubs of San Francisco, the San Francisco Mounted Police unit, and numerous rescue and animal welfare organizations.  SFDOG actively participated in the scoping process relating to GGNRA's 2017 Dog Management Plan and its accompanying environmental impact statements.  SFDOG and its members also actively participated in the Service's past NEPA process related to the 2017 Dog Management Plan, including the prior FOIA suit against the GGNRA concerning its refusal to produce public records about that process.  SFDOG and its members remain actively engaged in protecting their interests in the GGNRA, including most recently by submitting comments addressing the procedural and substantive deficiencies of the 2019 Compendium.

23.     Marin County Dog Owners Group (Marin DOG) was founded in 2013 in response to the release of the GGNRA's environmental review materials relating to the 2017 Dog Management Plan.  Marin DOG is a grassroots organization with a network reach of over 1000 people and considers itself a watchdog for fair pet policies in Marin County.  Marin DOG supports environmental stewardship, and believes that stewardship and recreational use are compatible—as they have been for decades.  Marin DOG has partnered with the Marin Humane Society and other GGNRA stakeholder groups to support programs that educate the public on how to share our open spaces responsibly.  Marin DOG has also launched stewardship programs

and conducted educational outreach campaigns.   It works to improve communications, offer solutions and elevate dog owner representation with GGNRA, Marin County Parks and Open Space, Marin Municipal Water District, local Community Service Districts and local parks and recreation areas.  Marin DOG has an interest in the GGNRA's attempt to impose major aspects of the 2017 Dog Management Plans through the 2019 Compendium.

24.   Coastside Dog Owners Group of San Mateo County (Coastside DOG) is dedicated to promoting responsible dog walking and advocating for dog-friendly open space on the San Mateo County coast.  The group (formerly Montara Dog Group) was initially founded in 2008 to celebrate the community's longstanding culture of dog walking and stewardship at Rancho Corral de Tierra (Rancho)—an area which many of its members helped save from development when it was owned by Peninsula Open Space Trust.  Coastside DOG has placed and maintained pet waste bags and bins throughout Rancho since 2008, and still provides the only trash removal service at Rancho. In addition, Coastside DOG has sponsored community trail etiquette trainings designed to promote safety and best practices in multi-use trail recreation at Rancho and other local open space areas. The trainings bring together dog walkers, equestrians, and cyclists to practice simple etiquette rules to ensure a positive recreational experience for all.  Today, Coastside DOG has grown to nearly 500 members spanning from Pacifica to Half Moon Bay, and has expanded its mission to include advocating for dog-friendly open space on the entire San Mateo County coast. Coastside DOG (then the Montara Dog Group) and its members submitted comments to the GGNRA regarding the 2017 Dog Management Plan and associated environmental review materials.  Coastside DOG submitted comments to the GGNRA identifying the unlawfulness of the its attempt to smuggle major components of the failed 2017 Dog Management Plan into effect through the 2019 Compendium without the requisite notice-and-comment rulemaking process.

25.   Thousands of individuals and organizations, including Plaintiffs and their members, submitted comments on the GGNRA's 2017 Dog Management Plan objecting to efforts to restrict access to dog walking in the GGNRA.  Plaintiffs and their members have

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

discussed the potential effects of the 2019 Compendium with many individuals, other citizen groups, and organizations in the three counties and the larger Bay Area.   Thousands of individuals in the San Francisco Bay Area are interested in the significant policy decisions reflected in the 2019 Compendium.  Just as many newspaper articles were written about the 2017 Dog Management Plan, unsurprisingly, many have also been written about—and in opposition to—the 2019 Compendium's impact on dog walking in the GGNRA.  Further, those restrictions on dog walking have implications for other traditional recreational uses of the GGNRA.

26.     Plaintiffs and their members regularly recreate within the GGNRA, and the amendments in the 2019 Compendium directly impact their activities and interests.  Absent relief from this Court, Plaintiffs will be irreparably harmed by the GGNRA's unlawful conduct.

27.     Defendant NPS is the agency responsible for regulation of the use of all national parks; although the GGNRA is not a national park – it is a national recreation area—the NPS is responsible for its regulation and management.  The NPS is an agency within defendant United States Department of Interior.

28.     Defendant GGNRA is a federal recreation area administered by the Service.  The GGNRA operates under the Department of the Interior and NPS regulations, policies and guidelines.

## LEGAL BACKGROUND

### A.     Administrative Procedure Act

29.     The Administrative Procedure Act (APA) provides judicial review for persons who have been adversely affected or aggrieved by a final agency action for which there is no other adequate remedy in a court.  5 U.S.C. §§ 551(2), 701-702, 704.  Violations of NPS regulations implementing the National Park Service Organic Act (Organic Act) and violations of the National Environmental Policy Act (NEPA) are subject to judicial review under the APA.

30.     Under the APA, a reviewing court must "hold unlawful and set aside agency action, findings, and conclusions" found to be, among other things, "arbitrary, capricious, an

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law."  5 U.S.C. § 706(2)(A), (D).

31.     Pursuant to the APA, an agency adopting a rule generally must engage in the rule making process and adhere to specific notice-and-comment requirements.  *See* 5 U.S.C. §§ 551(5), 553.  Subject to enumerated exceptions, rules that must adhere to notice-and-comment requirements include "agency statement[s] of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy . . . ."  *Id.* § 551(4).

32.     Agency actions that have the force of law, including actions that provide a new basis of liability, are legislative (or substantive) rules subject to the APA's notice-and-comment requirements.  *See Gill v. U.S. Dep't of Justice*, 913 F.3d 1179, 1186 (9th Cir. 2019); *Erringer v. Thompson*, 371 F.3d 625, 630 (9th Cir. 2004) ("[I]f there is no legislative basis for enforcement action on third parties without the rule, then the rule necessarily creates new rights and imposes new obligations.  This makes it legislative." (quotation marks and citation omitted)).

**B.     National Park Service Organic Act and Implementing Regulations**

33.     The Golden Gate National Recreation Area (GGNRA) was established "[i]n order to preserve for public use and enjoyment certain areas of Marin and San Francisco Counties, California, possessing outstanding natural, historic, scenic, and recreational values, and in order to provide for the maintenance of needed recreational open space necessary to urban environment and planning . . . ."  Pub. L. No. 92-589, § 1, Oct. 27, 1972, 86 Stat. 1299; 16 U.S.C. § 460bb.  Congress specifically identified dog walking as a recreational activity that would continue to occur in the GGNRA.  *See* House Report No. 92-1391, p. 4852.  Since its establishment as a national recreation area, Congress has expanded the GGNRA several times. *See, e.g.*, Pub. L. No. 93-544, Dec. 26, 1974, 88 Stat. 1741 (adding 750 acres of contiguous private lands in Marin County to the GGNRA); Pub. L. No. 96-199, Mar. 5, 1980, 94 Stat. 67 (extending GGNRA's northern boundary); Pub. L. No. 96-607, Dec. 28, 1980, 94 Stat. 3544 (expanding GGNRA into San Mateo County and along the coast).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

34.     As a part of the National Park System, NPS manages the GGNRA in accordance with the Organic Act to "promote and regulate the use of the National Park System" to "conserve the scenery, natural and historic objects, and wild life in the System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations."  54 U.S.C. § 100101.  The Organic Act empowers the Secretary of the Interior to "prescribe such regulations as the Secretary considers necessary or proper for the use and management of System units."  *Id.* § 100751(a).

35.     NPS regulations authorize superintendents of recreational areas to, consistent with applicable laws, impose and terminate restrictions, limits, closures, designations, conditions, and visiting hour restrictions in the recreation areas they oversee.  36 C.F.R. § 1.5(a). Superintendents' compendia are used, in part, to document such measures.  *See* NPS Management Policies 2006 at 86, *available at* https://www.nps.gov/policy/MP_2006.pdf.

36.     When adopting or terminating such a measure, NPS must strictly adhere to established substantive and procedural protocols.  Its own regulations provide:

> Except in emergency situations, a closure, designation, use or activity restriction or condition, or the termination or relaxation of such, which is of a nature, magnitude and duration that will result in a significant alteration in the public use pattern of the park area, adversely affect the park's natural, aesthetic, scenic or cultural values, require a long-term or significant modification in the resource management objectives of the unit, or is of a highly controversial nature, <u>shall be published as rulemaking in the Federal Register</u>.

36 C.F.R. § 1.5(b)(emphasis added).

37.     Before "implementing or terminating a restriction, condition, public use limit or closure, NPS must "prepare a written determination justifying the action" that sets forth the reasons why the restriction, condition, public use limit or closure has been established and why less restrictive measures will not suffice.  36 C.F.R. § 1.5(c).  In the case of an action terminating a restriction, condition, public use limit or closure, the Service must provide a written

-12-
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

determination of why the restriction is no longer necessary and a finding that the termination will not adversely affect park resources.  *Id.*

38.     NPS regulations also provide that "[v]iolating a closure, designation, use or activity restriction or condition, schedule of visiting hours, or public use limit is prohibited."  *Id.* § 1.5(f).

39.     NPS regulations further provide that a "person convicted of violating a provision of the regulations contained in parts 1 through 7," including regulations governing the GGNRA, will be subject to criminal penalties under 18 U.S.C. § 1865.  *Compare* 36 C.F.R. § 1.3 *with id.* § 7.97.

**C.     National Environmental Policy Act**

40.     The National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 *et seq.*, is the basic national charter for the protection of the environment.  NEPA's purpose is to help public officials make decisions that are based on an understanding of environmental consequences, and take actions that protect, restore, and enhance the environment.  40 C.F.R. § 1500.1(c).

41.     NEPA requires federal agencies to prepare an Environmental Impact Statement (EIS) for all "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(C).

42.     When a federal agency is not certain whether an EIS is required, it must prepare an Environmental Assessment (EA).  40 C.F.R. §§ 1501.3, 1501.4, 1508.9.  If the EA concludes that the proposed project will have no significant impact on the human environment, the agency may issue a Finding of No Significant Impact (FONSI) and proceed with the proposed action.  If the agency concludes that there may be significant impacts, then it must prepare an EIS.  *Id.* § 1501.4.

43.     To determine whether a proposed agency action may produce significant impacts, "NEPA requires consideration of both context and intensity."  *Id.* § 1508.27.  Significance "must be analyzed in several contexts," including "the affected region, the affected interests, and the locality."  *Id.* § 1508.27(a).  To evaluate intensity, the agency is to consider, *inter alia*, "[t]he

-13-

degree to which the effects on the quality of the human environmental are to be highly controversial" and "[t]he degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration." *Id.* § 1508.27(b).

44.     The U.S. Department of the Interior has adopted regulations implementing NEPA that supplement those regulations adopted by the Council on Environmental Quality. *See generally* 43 C.F.R. § 46.10 *et seq.* These regulations are binding on all constituent bureaus, which include services such as NPS. *See id.* §§ 46.10(a); 46.30. NPS recognizes that it is bound by these regulations and adheres to them. *See generally* National Park Service NEPA Handbook 2015, *available at*

https://www.nps.gov/subjects/nepa/upload/NPS_NEPAHandbook_Final_508.pdf.

45.     Generally, actions determined to have "no significant individual or cumulative effect on the quality of the human environment" are considered "categorically excluded" from the requirement to prepare an EA or an EIS. *See* 43 C.F.R. § 46.205(a) (describing actions categorically excluded from further NEPA review); 40 C.F.R. § 1508.4; *see also* 43 C.F.R. § 46.210 (listing departmental categorical exclusions).

46.     Even where an agency action would normally be categorically excluded from further NEPA review, the agency must "determine whether [the proposed action] meets any of the extraordinary circumstances in section 46.215; if it does, further analysis and environmental documents must be prepared for the action." 43 C.F.R. § 46.205(c)(1).

47.     The identified criteria that establish extraordinary circumstances within categorical exclusions include proposed actions that "[h]ave highly controversial environmental effects or involve unresolved conflicts concerning alternative uses of available resources" or "[e]stablish a precedent for future action or represent a decision in principle about future actions with potentially significant environmental effects." *Id.* § 46.215(c)-(d).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**FACTUAL BACKGROUND**

48.     The GGNRA consists of lands in San Mateo, San Francisco and Marin Counties that have been used by Bay Area residents for recreation for much of the last century.

49.     Thousands of Bay Area residents walk dogs in the GGNRA every day.

50.     Dog walking in the GGNRA predates Congress' creation of the recreation area in 1972 by decades.

51.     Congress contemplated that dog walking would be an important recreational activity that would continue in the GGNRA.  *See, e.g.*, House Rep. No. 92-1391, p. 4852.

52.     In 1978, the GGNRA Citizens' Advisory Commission (the Commission) proposed a Pet Policy after receiving input from park staff and the public.  That Policy provided general guidance on dog walking and recommended certain locations in the park for on-leash and off-leash (or "voice control") dog walking.

53.     Subsequently, the Commission recommended the Pet Policy to the GGNRA Superintendent for adoption as a GGNRA-specific policy (later known as the "1979 Pet Policy").

54.     The 1979 Pet Policy has governed dog walking activities in the GGNRA for decades.

55.     When the GGNRA has attempted to restrict dog walking access beyond the terms of the 1979 Pet Policy, organizations of dog walkers have, on multiple occasions, successfully challenged those attempted restrictions.

56.     In the late 1990s, for example, the GGNRA sought to close to dogs 12 acres of a previously off-leash recreational area at Fort Funston.  81 Fed. Reg. 9,139, 9,141 (Feb. 24, 2016).

57.     Dog walking groups successfully challenged that closure in this Court.  That Court determined that GGNRA's closure likely constituted a significant alteration in public use pattern and was highly controversial, such that GGNRA would have had to provide notice and an opportunity for public comment in accordance with its regulations.  *See generally Fort Funston Dog Walkers* v. *Babbitt,* 96 F. Supp. 2d 1021 (N.D. Cal. 2000).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

58.     Approximately two years later, after finding that the longstanding 1979 Pet Policy was in conflict with the National Park System-wide regulation requiring dogs to be leashed, GGNRA rescinded the 1979 Pet Policy by publishing a notice in the *Federal Register*, but provided no opportunity for public comment.  81 Fed. Reg. at 9,141.

59.     Subsequently, persons cited by GGNRA employees for walking their dogs off-leash consistent with the 1979 Pet Policy challenged the rescission of that Policy in this Court. *See generally United States v. Barley*, 405 F. Supp. 2d 1121 (N.D. Cal. 2005).

60.     The Court concluded that not only did the rescission "work a significant alteration of public use pattern of the park area, but it was of a highly controversial nature." *Id.* at 1125 (quotation marks and citation omitted).  The Court thus determined that the attempted rescission of the 1979 Pet Policy was invalid because the agency failed to follow its own regulations by not providing the requisite opportunity for public comment.  *Id.* at 1126.

61.     Since the *Barley* decision, the 1979 Pet Policy has remained in effect, except for portions of Ocean Beach and Crissy Field, where the GGNRA adopted a special regulation to restrict off-leash dog walking to protect sensitive wildlife.  *See* 36 C.F.R. § 7.97(d).

62.     Another effort to limit GGNRA access to persons walking dogs was undertaken in 2011 when the GGNRA released its draft Dog Management Plan and Environmental Impact Statement (collectively, the Draft Dog Plan).  It provided 135 days for public comment on the Draft Dog Plan, having extended the comment period once due, in part, to public interest.

63.     A related draft Dog Management Plan and Supplemental EIS (collectively, the Supplemental Draft Dog Plan) was published on September 6, 2013.  GGNRA provided 162 days for public comment on the Supplemental Draft Dog Plan, having extended the comment period twice due, in part, to public interest.

64.     The preferred alternative of the Supplemental Draft Dog Plan would have placed new limitations on dog walking in the GGNRA, including, *inter alia*, entirely closing areas to dog walking and limiting areas where off-leash dog walking would be allowed.

-16-
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

65.     On February 24, 2016, the agency published in the *Federal Register*, at 81 Fed. Reg. 9,139, a proposed rulemaking to implement this preferred alternative (Dog Rule).  It provided 90 days for public comment on the Dog Rule, having extended the comment period once due, in part, to public interest.

## PLAINTIFFS' PROSECUTE FREEDOM OF INFORMATION ACT SUIT AND AVERT MIDNIGHT DOG RULE

66.     In the meantime, in fall 2015 Plaintiffs had submitted a Freedom of Information Act (FOIA) request, seeking information related to the Draft Dog Plan and Supplemental Draft Dog Plan that was not already publicly available.

67.     After the GGNRA refused to provide the public records identified in their FOIA request, Plaintiffs filed a FOIA lawsuit on April 5, 2016.  The public records ultimately produced by the GGNRA in fall 2016 showed the misconduct in the dog planning process set forth above.

68.     NPS released its Final Dog Management Plan and Environmental Impact Statement on or about December 9, 2016.  NPS explained that it would proceed to publish the Dog Rule after the 30-day period required by NEPA had run.  In other words, NPS stated its intent to push the Dog Rule across the finish line and give it the force of law as a "midnight regulation" – just prior to the change of Administrations.

69.     On January 10, 2017, following the disclosure of the GGNRA's e-mails to the public on woofieleaks.com, NPS stated it was delaying further consideration of the Dog Rule pending completion of an investigation into the GGNRA's misconduct, as revealed by the e-mails.

70.     Nearly a year later, on December 27, 2017, NPS announced that it "no longer intend[ed] to prepare a final rule or issue a Golden Gate National Recreation Area dog management plan. The NPS has terminated the rulemaking process."  *See* 82 Fed. Reg. 61,199 (Dec. 27, 2017).

### THE 2019 GGNRA SUPERINTENDENT'S COMPENDIUM

71.     Having repeatedly failed to accomplish its aim to drastically curtail dog walking in the GGNRA, the agency is now taking a new approach to achieve the same end.  On August 30, 2019—the Friday before Labor Day weekend—the GGNRA posted on its website the 2019 Superintendent's Compendium (2019 Compendium).

72.     The 2019 Compendium was not published as a rulemaking in the *Federal Register*; it was not subjected to the related notice-and-comment process.

73.     Nor did the GGNRA develop an EIS or an Environmental Assessment in accordance with the National Environmental Policy Act (NEPA).

74.     The 2019 Compendium amends the existing 1979 Pet Policy by imposing significant new requirements for and restrictions on access for people with dogs.

75.     The 2019 Compendium, while not identical, is substantially similar to elements of the withdrawn Dog Plan.  Many of these amendments, including changes made to the definitions of "Unmanaged Dogs," "Voice Control," and "Managed Dogs," mirror measures contained in that failed Dog Plan.

76.     The 2019 Compendium also includes a measure implementing the Dog Plan's requirement that dogs wear identification tags confirming proof of rabies vaccination status or, in limited circumstances, that owners produce official documentation of rabies vaccination status on demand.

77.     In addition, although the 2019 Compendium was issued with an accompanying table purportedly identifying changes made since the 2017 Compendium, that table was incomplete.  Trail closures indicated on Exhibit Maps #37, #38, and #39, which were not noted on the table of changes, indicate that dog walking would be eliminated on trails at the southern entrance to Milagra Ridge; parts of the Milagra Ridge trail and the Milagra Creek Overlook trail; two trails at Mori Point, including the Mori Bluff Trail, that are not closed to persons without dogs; and many trails in Rancho Corral de Tierra, despite a 2013 GGNRA agreement with

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Congresswoman Jackie Speier that opened all Rancho Corral de Tierra trails to on-leash dog walking.

78.     The 2019 Compendium also bans dog walking entirely from two areas at Fort Funston where they have been allowed off-leash according to the 1979 Pet Policy. It also includes a new mechanism for future closures at Fort Funston and elsewhere – that GGNRA staff can ban dog walking from areas now and in the future simply by posting a sign that says "sensitive restoration area," without going through any notice-and-comment rulemaking process before the closure goes into effect. This will allow GGNRA staff to institute, over time and in piecemeal fashion, the major access closures contained in the terminated Dog Management Plan at Fort Funston and elsewhere, without going through the notice-and-comment rulemaking process required for substantial and highly controversial changes to recreational access.

79.     Concerned by these and other changes, on September 16, 2019, Plaintiffs, through the undersigned counsel, sent a letter by electronic mail and U.S. Mail to Superintendent Laura Joss outlining their legal concerns associated with the GGNRA imposing such significant and controversial changes to dog walking policy through the 2019 Compendium.

80.     On September 23, 2019, having received no response to counsel's letter, representatives of Coastside DOG participated in a phone call with Michael Savidge, the Director of Strategic Planning and Partnership for GGNRA.

81.     During that phone call, Mr. Savidge confirmed that the table of changes accompanying the 2019 Compendium is not comprehensive.  He noted that the exhibit maps showing additional changes are for illustrative purposes only, were intended for internal use by law enforcement, and that a separate set of maps will be provided for public use.  Mr. Savidge also stated that although the 2019 Compendium included access closures at Muir Beach and Rodeo Beach when water is flowing between the lagoons and the ocean, he was not aware of how those closures would be enforced.

82.     On September 27, 2019, 28 days into the 30-day public comment period, the GGNRA released a draft memorandum from Chief Park Ranger David Schifsky to General

-19-
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Superintendent Laura Joss titled "2019 Superintendent's Compendium Changes and Justifications."  In that memorandum, Chief Ranger Schifsky states that:

> While some of the 1979 Pet Policy's provisions had been incorporated previously in to the park's Compendium, the Pet Policy had not been reviewed in light of on-the-ground changes that have occurred since 1979 and new information regarding resource management concerns, visitor use conflicts, and public safety considerations. . . . The 2019 Compendium proposes slight modifications to the Pet Policy to address changed field conditions (including expanded Voice Control in one area), new resource protection considerations, and multiple and sometimes conflicting forms of public uses. We have also translated the 1979 Pet Policy into clear regulatory language, with accompanying maps herein demarcating on leash and Voice Control areas, to assist dog walkers in planning their visit to the park.

83.     On October 16, 2019, plaintiffs SFDOG and Coastside DOG submitted written comments reattaching the September 16, 2019 letter from Plaintiffs' counsel.  Those letters detailed the scope of the changes between the 2017 Compendium and the 2019 Compendium, as well as similarities between the failed Dog Plan and the 2019 Compendium.

84.     On October 18, 2019, Plaintiffs, along with Congresswoman Jackie Speier, met with GGNRA Superintendent Laura Joss to discuss the changes proposed in the 2019 Compendium, describe Plaintiffs' concerns, and attempt to resolve the situation without resorting to litigation.  Although Superintendent Joss agreed to correct "labeling errors" on certain exhibit maps, she failed to address Plaintiffs' primary concerns regarding the inappropriately broad scope of the highly contentious changes included in the 2019 Compendium.

85.     Despite the GGNRA's attempts to characterize the changes in the 2019 Compendium as "minor," the similarities between this document and the Dog Plan refute that characterization.  Significant and highly controversial changes like those contained in the 2019 Compendium cannot be made, except by rulemaking published in the *Federal Register* after having undergone the requisite NEPA review.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**CLAIMS FOR RELIEF**
**FIRST CLAIM**
**(Violation of 36 C.F.R. § 1.5)**

86. Plaintiffs incorporate by reference all previous allegations for purposes of this claim.

87. NPS violated its own regulations by failing to publish the 2019 Compendium in the *Federal Register* as a rulemaking subject to notice-and-comment requirements. NPS regulations require:

> [A] closure, designation, use or activity restriction or condition, or termination or relaxation of such, which is of a nature, magnitude and duration that will result in a significant alteration in the public use pattern of the park area, adversely affect the park's natural, aesthetic, scenic or cultural values, require a long-term or significant modification in the resource management objectives of the unit, or is of a highly controversial nature, shall be published as rulemaking in the Federal Register.

36 C.F.R. § 1.5(b).

88. The 2019 Compendium, among other things, imposes new closures and restrictions and conditions on uses and activities in the GGNRA. These closures, restrictions, conditions, and other changes dramatically limit and alter historical access and allowable activities for people with dogs throughout the Recreation Area. The 2019 Compendium, for example, prohibits on-leash dog walking in new areas (*e.g.*, San Mateo County locations of the GGNRA) and restricts off-leash dog walking in other areas (*e.g.*, Ocean Beach). The 2019 Compendium also adopts new vague definitions (*e.g.*, "unmanaged dogs," "voice control," and "managed dogs") that effectively grant unfettered discretion to GGNRA employees to enforce related restrictions.

89. Many of the changes made in the 2019 Compendium mirror the changes the GGNRA attempted to make in its highly controversial proposed Dog Management Plan that the NPS terminated in December 2017.

90. These changes constitute a "significant alteration in the public use pattern of the park area" and are "of a highly controversial nature." Indeed, this Court has found more than once that restrictions on dog walking in the GGNRA are highly controversial and, independently,

-21-
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

constitute significant alterations in the public use pattern of the park area.  *See, e.g.*, *United States v. Barley*, 405 F. Supp. 2d 1121, 1125 (N.D. Cal. 2005) ("After more than twenty years of consistently approving and designating areas for off-leash dog walking, the GGNRA clearly engaged in an 'activity restriction' when it suddenly reversed field, closed all areas for off-leash use, and started citing off-leash dog walkers.  Not only did this activity restriction work a 'significant alteration in the public use pattern of the park area,' but it was of a 'highly controversial nature.'"); *Ft. Funston Dog Walkers v. Babbitt*, 96 F. Supp. 2d 1021, 1035 (N.D. Cal. 2000) (explaining that the "administrative record is replete with evidence that the [NPS] was aware the closure [related to dog walking] would be highly controversial").

91.     The GGNRA published the 2019 Compendium on its website on August 30, 2019.  Even though the changes clearly are highly controversial and constitute significant alterations in public use patterns in the area, and the GGNRA fully knows this, it did not to publish the 2019 Compendium in the *Federal Register* or undertake the requisite notice-and-comment rulemaking process.  The GGNRA's refusal to do this was unlawful.  36 C.F.R. § 1.5(b); *Barley*, 405 F. Supp. 2d at 1125 ("The whole point of Section 1.5(b) was to allow the public an opportunity to be heard *before* such a change occurred.").

92.     Instead of providing for public participation as required, the GGNRA discreetly published the 2019 Compendium on August 30, 2019, the Friday before Labor Day Weekend.

## SECOND CLAIM
### (Violation of APA 5 U.S.C. § 553)

93.     Plaintiffs incorporate by reference all previous allegations for purposes of this claim.

94.     In addition, the GGNRA's failure to subject the 2019 Compendium to notice-and-comment requirements violated the APA.

95.     The 2019 Compendium is a legislative rule subject to notice-and-comment requirements because it carries the force of law.  Persons deemed by GGNRA employees to be in violation of the 2019 Compendium's measures are subject to civil, and potentially criminal,

liability.  *See* 36 C.F.R. §§ 1.3; 1.5(f).  And without the 2019 Compendium, the GGNRA could not issue citations or impose penalties.  *See Erringer v. Thompson*, 371 F.3d 625, 630 (9th Cir. 2004) (citing *Hemp Indus. Ass'n v. Drug Enf't Admin*, 333 F.3d 1032, 1088 (9th Cir. 2003) ("[I]f there is no legislative basis for enforcement action on third parties without the rule, then the rule necessarily creates new rights and imposes new obligations.  This makes it legislative."); s*ee also Gill v. Dept. of Justice*, 913 F.3d 1179, 1186 (9th Cir. 2019) ("Legislative rules have the 'force of law,' and are subject to notice and comment under the APA before becoming effective.").

96.     Because the 2019 Compendium constitutes a legislative rule, the APA required the GGNRA to adhere to the notice-and-comment requirements of 5 U.S.C. § 553.

### THIRD CLAIM
### (Violation of NEPA 42 U.S.C. § 4321 *et seq.*)

97.     Plaintiffs incorporate by reference all previous allegations for purposes of this claim.

98.     NEPA required the GGNRA to prepare an EIS, or at minimum, an EA before publishing the 2019 Compendium.

99.     The GGNRA's reliance on a categorical exclusion found in the NPS NEPA Handbook was improper.  First, the GGNRA failed to follow binding NEPA regulations that required the agency to "evaluate[]" and "determine whether it meets any of the extraordinary circumstances in section 46.215."  43 C.F.R. § 46.205(c)(1).  The GGNRA equally failed to follow the categorical exclusions process delineated in the NPS NEPA Handbook, which required it to: (1) define the proposed action, identify issues, and evaluate associated impacts; (2) determine whether there is a categorical exclusion that could apply to the proposed action; (3) determine whether any extraordinary circumstances exist; and (4) document the potential impacts of the action covered by the categorical exclusion.  NPS NEPA Handbook at 38-39.

100.     Second, the GGNRA failed to adequately explain its decision to apply the categorical exclusion.  *Sierra Club v. Bosworth*, 510 F.3d 1016, 1026 (9th Cir. 2007).  Its

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

conclusory single sentence stating that "[t]he proposed changes will enhance the park's ability to protect park resources, public health and safety, and address visitor use concerns" is inadequate.

101.    Third, the 2019 Compendium does not reasonably fall within the ambit of the categorical exclusion the GGNRA relies on—"[m]inor changes in amounts or types of visitor use for the purpose of ensuring visitor safety or resource protection in accordance with existing regulations." Among other things, the new closures and other restrictions for on- and off-leash dog walking and other changes made by the 2019 Compendium cannot reasonably be characterized as minor when considered in context.

102.    Fourth, regardless of the applicability of the invoked categorical exclusion, the GGNRA's reliance on that exclusion was unreasonable because the extraordinary circumstances exception applies in this case. Restrictions, limitations, designations, and conditions related to dog walking in the GGNRA are highly controversial, considering the degree of public involvement surrounding these issues, including a substantial history of litigation over similar past GGNRA actions. Furthermore, the GGNRA is employing a segmented approach to accomplish what it could not do in one fell swoop in 2017—*i.e.*, it is seeking to establish precedent for future action.

103.    Accordingly, the GGNRA violated NEPA because it was required to prepare an EIS, or, at minimum, an EA before publishing the 2019 Compendium.

**FOURTH CLAIM**
**(Violation of APA 5 U.S.C. § 706)**

104.    Plaintiffs incorporate by reference all previous allegations for purposes of this claim.

105.    The GGNRA failed to provide the requisite reasoned justification and explanation for numerous measures in the 2019 Compendium, including those related to closures, limitations related to on- and off-leash dog walking, and other changes.

106.    The APA requires agency decision-making to be reasoned. Courts are precluded from attempting "to make up for such deficiencies" and cannot "supply a reasoned basis for the

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

agency's action that the agency itself has not given." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983).

107.    Separately, NPS regulations implementing the Organic Act also require "a written determination justifying the action," and that determination must "set forth the reasons why the restriction, condition, public use limit or closure has been established and why less restrictive measures will not suffice."  36 C.F.R.§ 1.5(c).

108.    The GGNRA wholly failed to provide any written justification for numerous measures in the 2019 Compendium.  This void of reasoning violates the APA and regulations implementing the Organic Act.

109.    In several instances where the GGNRA provided a written statement, the reasons offered were conclusory, unreasoned, lacked supporting evidence, unclearly attributed, and otherwise deficient in contravention of the APA and the regulations implementing the Organic Act.

110.    In publishing the 2019 Compendium, the GGNRA also violated the regulations implementing the Organic Act by failing to explain why less restrictive measures would not suffice.

111.    This lack of, and otherwise insufficient, reasoning to support its measures renders the 2019 Compendium unlawful.

**FIFTH CLAIM**
**(Violation of APA 5 U.S.C. § 706)**

112.    Plaintiffs incorporate by reference all previous allegations for purposes of this claim.

113.    The 2019 Compendium is independently unlawful because the GGNRA failed to follow the APA's requirements for agency policy changes.

114.    "Unexplained inconsistency between agency actions is a reason for holding an interpretation to be an arbitrary and capricious change." *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015) (quotation marks and citation omitted).

-25-
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

115. "[A] policy change complies with the APA [only] if the agency (1) displays awareness that it is changing position, (2) shows that the new policy is permissible under the statute, (3) believes the new policy is better, and (4) provides good reasons for the new policy, which, if the new policy rests upon factual findings that contradict those which underlay its prior policy, must include a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Id.* (quotation marks and citation omitted).

116. In releasing the 2019 Compendium, the GGNRA did not display an awareness of any specific policy changes it was making or provide good reasons for the new policies.

117. Since releasing the 2019 Compendium, the GGNRA was alerted to this deficiency and released a supplemental document entitled "2019 Superintendent's Compendium of Changes and Justifications" that attempts to overcome this shortfall. To the extent that then GGNRA has provided explanations in this or other documents, those explanations constitute impermissible *post hoc* rationalizations that cannot be relied upon to support the 2019 Compendium.

118. Regardless, those explanations are comprised of overly broad and otherwise summary justifications insufficient to satisfy the APA's requirements for an agency policy change.

119. The 2019 Compendium is thus unlawful for these separate reasons.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs ask that the Court enter judgment that includes the following relief:

1. An order directing Defendants to vacate and set aside the 2019 Compendium until they comply with all applicable laws, including NEPA and the APA.

2. An order granting Plaintiffs an award of attorneys' fees and costs under the Equal Access to Justice Act, 28 U.S.C. § 2412, or any other applicable law; and

3. An order granting Plaintiffs such other relief as the Court deems just and proper.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1    DATED:  December 12, 2019                 BAKER BOTTS LLP

2

3                                              /s/ Christopher J. Carr
                                               CHRISTOPHER J. CARR
4                                              Attorneys for Plaintiffs
                                               SAVE OUR RECREATION, SAN
5                                              FRANCISCO DOG OWNERS GROUP,
                                               MARIN COUNTY DOG OWNERS GROUP
6                                              and COASTSIDE DOG OWNERS GROUP

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                        -27-
     COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF